UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

GEORGE STEWART,
        Plaintiff,

v.                                                      No. 5:23-CV-007-H

TEXAS TECH UNIVERSITY HEALTH
SCIENCES CENTER, et al.,
        Defendants.

## MEMORANDUM OPINION AND ORDER

In this case, George Stewart sues six public medical schools in the Texas Tech and University of Texas systems due to their alleged use of race and sex preferences in student admissions. The defendants move to dismiss the suit, and UT moves to sever the claims against its defendants and transfer them to Austin. Stewart's complaint raises serious allegations, but much has changed since he first brought it. First, the Supreme Court held in *Students for Fair Admissions* that race-conscious admissions policies are unconstitutional. Second, in August 2023, UT's Board of Regents repealed its rule that authorized UT institutions to develop and implement affirmative-action plans, and the Board further directed its general counsel to make changes in other rules as necessary to comply with *SFFA*. As a result of these developments, the plaintiff's race-discrimination claims for declaratory or injunctive relief against UT are moot and are dismissed. Stewart has, however, sufficiently alleged standing and his cause of action for the remaining race-based claims. But he has not plausibly alleged that the defendants used sex preferences, so his sex-discrimination claims are dismissed. Finally, the Court grants UT's motion to sever and transfer. UT was improperly joined with Tech because the two systems—and their admissions policies and decisions—are distinct and operate independently of one another.

Thus, the Court grants in part and denies in part UT's motion to dismiss (Dkt. No. 35) and Tech's motion to dismiss (Dkt. No. 33). UT has demonstrated that the plaintiff's race-based claims for prospective relief are moot, and the Court dismisses those claims against the UT defendants without prejudice under Rule 12(b)(1). In contrast, the Court concludes that the plaintiff has standing for his surviving race-based claims and has plausibly alleged that the defendants used race-based admissions preferences. He has not, however, plausibly alleged the use of sex-based preferences, which both deprives him of standing on those claims and fails to state a claim. Accordingly, the Court dismisses his Title IX claim and his sex-based Equal Protection claim under Rule 12(b)(1) and 12(b)(6). With no claims remaining against them, the Court dismisses the individual UT defendants entirely. The plaintiff's Title VI, Section 1981, and Equal Protection claims based on racial preferences survive against all Tech defendants, and his Title VI claim for damages survives against the institutional UT defendants. Should Stewart choose to attempt to remedy the flaws identified in this Order, the Court grants him leave to amend his complaint within 14 days from the date of this Order.

Although some claims against UT survive, they cannot proceed with the claims against Tech in this Court. The two university systems are independent from one another, are governed by different boards of regents, and have different admissions policies. Thus, the UT defendants are improperly joined with the Tech defendants under Rule 20 because the claims against the two groups do not arise out of the same series of transactions or occurrences. Once severed, the claims against UT are not properly brought in this division. But the claims could have been brought in Austin, and Austin is the most convenient venue for the parties. Accordingly, the Court grants UT's motion to sever and transfer the claims

against UT to the Western District of Texas, Austin Division (Dkt. No. 36).  The Clerk of

Court is directed to sever the claims against the remaining UT defendants—University of

Texas at Austin, UT Health Science Center at Houston, UT Medical Branch at Galveston,

UT Health Science Center at San Antonio, and UT Southwestern Medical Center—into a

separate action and transfer that new civil action to the Western District of Texas, Austin

Division.

## 1.    Factual and Procedural Background

### A.    Factual Allegations[1]

The plaintiff, George Stewart, is a white male.  Dkt. No. 1 ¶ 51.  He wished to

become a physician and applied for admission at each of the defendant medical schools—

Texas Tech University Health Sciences Center (TTUHSC), Dell Medical School at the

University of Texas at Austin (UT Austin), McGovern Medical School at the University of

Texas Health Science Center at Houston (UT Houston), John Sealy School of Medicine at

the University of Texas Medical Branch at Galveston (UT Galveston), Long School of

Medicine at the University of Texas Health Science Center at San Antonio (UT San

Antonio), and University of Texas Southwestern Medical Center (UT Southwestern).  *Id.*

¶ 36.  He had an undergraduate GPA of 3.96 in biology, an MCAT score of 511, and

experience in medical facilities.  *Id.*  However, he was not admitted to the defendant

medical schools, "while over 450 lesser qualified minority students, ranging as low as a

GPA of 2.82 or an MCAT of 495, were offered admission."  *Id.*

---

[1] When considering a Rule 12(b)(1) and 12(b)(6) motion, a court "take[s] the well-pled factual
allegations of the complaint as true and view[s] them in the light most favorable to the plaintiff."
*Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

The plaintiff then "obtained the admissions data for each of the six medical schools through an open-records request, which revealed the race, sex, grade-point average, and MCAT score of every applicant in the 2021–2022 cycle." *Id.* ¶ 37.  Those records show that "the median and mean grade-point averages and MCAT scores of admitted black and Hispanic students are significantly lower than the grade-point averages and MCAT scores of admitted white and Asian students." *Id.* ¶ 38.  For each medical school, the plaintiff provides a graph of the distributions of admitted students' MCAT scores, divided by racial group.  *See id.* ¶¶ 39–47.  Those graphs reveal that at each school the median MCAT scores of black and Hispanic admitted students are several points lower than the median MCAT scores of white and Asian admitted students.  *See id.*  And at each of the UT medical schools, the 75th percentile score for admitted black students is about the same as or several points below the 25th percentile score for admitted white and Asian students.  *See id.*  For TTUHSC, the 75th percentile score for admitted black students is about the same as the 25th percentile score for Asian students and a little below the median score for white students.  *Id.* ¶ 41.  In addition, at UT Austin, Houston, and Galveston, there is "a statistically significant relationship between a positive admissions decision and an applicant's status" as black or Hispanic.  *Id.* ¶¶ 40, 42, 45.[2]

The plaintiff provides similar graphs of admitted students' MCAT scores divided by sex for each school except UT Austin.  *See id.* ¶¶ 39–47.  Those graphs demonstrate that at

---

[2] The plaintiff also cites an admissions policy at UT Galveston of, in short, intentionally recruiting and admitting underrepresented minorities—applicants who indicate a race or ethnicity of "American Indian, Alaska Native, Black, African American, Hispanic, Latino, Hawaiian, or Pacific Islander." Dkt. No. 1 ¶ 49.  However, UT notes that the policy was not in effect when the plaintiff applied to UT Galveston and is no longer in effect. Dkt. Nos. 35 at 10; 35-1 at 3.  Because the policy is not necessary for the Court's analysis and the parties do not devote much argument to it, the Court does not discuss it further.

each school except UT Southwestern the median MCAT scores of admitted female students are lower than the median scores of admitted male students.  *See id.* ¶¶ 41–47.  And at UT Austin and Galveston, there is "a statistically significant relationship between a positive admissions decision and an applicant's status as a female."  *Id.* ¶¶ 40, 45.

The plaintiff thus alleges that "[e]ach of the defendant medical schools and universities, along with nearly every medical school and university in the United States, discriminates on account of race and sex" by "providing admissions preferences to female, black, and Hispanic applicants while unlawfully discriminating against whites, Asians, and men in admissions decisions."  *Id.* ¶¶ 33, 48 (footnote omitted).  He alleges that these affirmative-action policies "allow[] applicants with inferior academic credentials to obtain admission at the expense of rejected candidates with better academic credentials."  *Id.* ¶ 33.

### B.    Procedural History and Subsequent Developments

The plaintiff filed suit against the six medical schools and various officials at those institutions in their official capacities[3] in January 2023, alleging violations of Title VI, Title

---

[3] The individual Tech defendants are Lori Rice-Spearman, President of TTUHSC; Steven Lee Berk, Dean of the School of Medicine; Lindsay Johnson, Associate Dean for Admissions and Student Affairs; Hollie Stanton, Senior Director for Admissions and Student Affairs; and Jeri Moravcik, Director of Admissions.  Dkt. No. 1 ¶¶ 5–9.

The individual UT Austin defendants are Jay Hartzell, President of the University of Texas at Austin; Claudia F. Lucchinetti, Dean of Dell Medical School; Travis Crook, Associate Dean of Student Affairs for Dell; and Joel A. Daboub, Director of Admissions and Records at Dell.  *Id.* ¶¶ 11–14; Dkt. No. 56.

The individual UT Houston defendants are Giuseppe N. Colasurdo, President of the UT Health Science Center at Houston; John Hancock, Executive Dean of the McGovern Medical School; and Margaret C. McNeese, Associate Dean for Admissions and Student Affairs.  Dkt. No. 1 ¶¶ 16–18.

IX, 42 U.S.C. § 1981, and the Equal Protection Clause. *Id.* ¶¶ 4–32, 60–85. He also seeks to certify a class of "all white and Asian men who stand 'able and ready' to apply for admission to any of these six medical schools." *Id.* ¶ 54. The plaintiff seeks declarations that "each of the defendants is violating Title VI and Title IX" and that "the individual defendants (but not the institutional defendants) are violating 42 U.S.C. § 1981(a) and the Equal Protection Clause." *Id.* ¶ 86. Additionally, he requests permanent injunctions preventing the defendants from "considering race or sex in student admissions" and from "asking or allowing an applicant for admission to reveal their race or sex." *Id.* He also asks the Court to appoint a court monitor overseeing admissions decisions and diversity offices at the medical schools. *Id.* Finally, he also requests nominal, compensatory, and punitive damages and attorneys' fees. *Id.*[4]

In June 2023, the Supreme Court decided *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* (*SFFA*), 600 U.S. 181 (2023). In that case, the Court held that the race-conscious admissions policies at Harvard College and the University of North

---

The individual UT Galveston defendants are Charles P. Mouton, President ad interim of UT Medical Branch; Jeffrey Susman, Interim Dean of the John Sealy School of Medicine; Ruth E. Levine, Associate Dean of Student Affairs and Admissions at Sealy; and Pierre W. Banks, Assistant Dean of Admissions and Recruitment at Sealy. *Id.* ¶¶ 20–23.

The individual UT San Antonio defendants are Robert A. Hromas, Acting President of UT Health Science Center at San Antonio and Dean of the Long School of Medicine; Belinda Chapa Gonzalez, Director of Admissions and Special Programs Undergraduate Medical Education at Long; and Chiquita Collins, Vice President for Diversity, Equity and Inclusion and Chief Diversity Officer. *Id.* ¶¶ 25–28; Dkt. No. 56.

The individual UT Southwestern defendants are Daniel K. Podolsky, President of UT Southwestern; W.P. Andrew Lee, Dean of the UT Southwestern Medical School; and Alanna Edwards, Director of Admissions and Recruitment at UT Southwestern Medical School. Dkt. Nos. 1 ¶¶ 30–32; 56.

[4] The case was initially stayed because the UT Austin defendants requested legal representation from the Texas Office of the Attorney General, but the OAG withheld its decision on that request for several months and declined to provide representation or authorize the hiring of outside counsel in the interim. *See* Dkt. Nos. 13 at 2–4; 19 at 2; 21; 24 at 2; 26.

Carolina violated the Equal Protection Clause, noting that "the student must be treated based on his or her experiences as an individual—not on the basis of race." *Id.* at 230–31.

Then, in August 2023, the Board of Regents of the University of Texas System repealed Regents' Rule 40304 (the Rule). Dkt. No. 35-1 at 3–5. That Rule "authorized" UT institutions "to develop and propose plans regarding whether to consider an applicant's race and ethnicity, as part of the institution's admissions or financial assistance policies, in accordance with" *Grutter v. Bollinger*, 539 U.S. 306 (2003), and *Gratz v. Bollinger*, 539 U.S. 244 (2003). Dkt. No. 35-1 at 7. It also imposed limits on those policies: before an institution could "propose to consider race or ethnicity," it had to "find[], after serious and good faith consideration, that race-neutral alternatives are inadequate" and "develop a written plan," and the proposals for policies considering race and ethnicity had to be "reviewed and approved by System Administration's Office of General Counsel, and by the appropriate Executive Vice Chancellor, prior to implementation." *Id.* But because the Board acknowledged that *SFFA* "prohibit[ed] the use of race as a factor in student admissions," it "formally document[ed] the repeal of Regents' Rule 40304." *Id.* at 5. The Board further explained that it directed its general counsel "to make changes in other Regents' Rules as necessary to comply with [*SFFA*]" and "[a]ccordingly . . . deleted" Rule 40304. *Id.*

The defendants filed motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. Nos. 33; 35. UT argues that the plaintiff's race-discrimination claims seeking prospective relief are moot in light of *SFFA* and the repeal of the Rule and that the plaintiff has failed to state a claim of intentional discrimination. Dkt. No. 35. Tech argues that because the plaintiff has not plausibly alleged race or sex discrimination, he

lacks standing and cannot state a claim.  Dkt. No. 33.  UT also filed a motion to sever and transfer venue, arguing that because UT is improperly joined with Tech under Rule 20, it should be severed under Rule 21 and transferred to the Western District of Texas, Austin Division.  Dkt. No. 36.  UT then moved to stay discovery and initial disclosures pending resolution of the outstanding motions, which the Court denied.  Dkt. Nos. 41; 42.  The plaintiff filed his responses to the motions (Dkt. Nos. 43; 44; 45), and the defendants replied (Dkt. Nos. 49; 50; 51).  All three motions are ripe for consideration by the Court.

The Court notes that in a typical case, if a court finds that severance and transfer is necessary, it transfers the case without addressing the merits of the claims.  However, certain unique factors are present here.  Both sets of defendants have challenged whether the federal courts have proper subject-matter jurisdiction over this case.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  Further, the Court had to consider the sufficiency of the complaint to decide Tech's Rule 12(b)(6) motion, and at this stage in the litigation, the allegations against each school are very similar.  Thus, the Court determines that there is considerable judicial efficiency in deciding all of the motions pending before it at this time.

## 2.    Motions to Dismiss

The Court finds that the plaintiff's race-based claims for prospective relief against UT are now moot due to *SFFA* and the repeal of the Regents' Rule.  Thus, those claims are dismissed against the UT defendants.  The Court also finds that the plaintiff has failed to plausibly allege an injury-in-fact and a claim for relief for his sex-based claims against UT and Tech, so those claims are also dismissed.  Because the individual UT defendants were only sued in their official capacity for prospective relief and all claims against them have

been dismissed, those individuals are dismissed.  However, the plaintiff has plausibly alleged his standing and his claim for his race-based claims for damages against the institutional UT defendants and all of his race-based claims against all Tech defendants. Thus, those claims survive dismissal.

### A.    Standards of Review

Both sets of defendants have moved to dismiss the complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b); Dkt. Nos. 33; 35.  In considering both a 12(b)(1) and 12(b)(6) motion, a court must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff."  *Lane*, 529 F.3d at 557.  A court should only dismiss the claim if it determines that the plaintiff has not pled a plausible set of facts that would establish jurisdiction and state a claim.  *See id.*

### i.    Rule 12(b)(1)

A party may challenge a court's subject-matter jurisdiction by a Rule 12(b)(1) motion to dismiss.  Fed. R. Civ. P. 12(b)(1); *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  When considering such a motion, "the court may find a plausible set of facts by considering any of the following: '(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'"  *Lane*, 529 F.3d at 557 (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).  The plaintiff, as the party asserting jurisdiction, "constantly bears the burden of proof that jurisdiction does in fact exist."  *Ramming*, 281 F.3d at 161.  Thus, at the pleading stage, the plaintiff

must "allege a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012).

A defendant may make either a facial attack or a factual attack on subject-matter jurisdiction. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981). For a facial attack, "the trial court is required merely to look to the sufficiency of the allegations of the complaint because they are presumed to be true." *Id.* For a factual attack, "the defendant submits affidavits, testimony, or other evidentiary materials." *Id.* Then, the plaintiff must "submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Id.* The Court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. May 1981) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). Accordingly, "the plaintiff should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence." *Id.* at 414. However, "an oral hearing is not always necessary if the parties receive an adequate opportunity to conduct discovery and otherwise present their arguments and evidence to the court." *In re Eckstein Marine Serv. L.L.C.*, 672 F.3d 310, 319–20 (5th Cir. 2012), *overruled on other grounds by In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787 (5th Cir. 2021).

Here, the parties have not requested an evidentiary hearing, and the Court finds that one is not necessary. The key facts of the Rule's repeal are undisputed. The parties have had the opportunity to conduct discovery, and the plaintiff has had the opportunity to present his arguments and evidence regarding jurisdiction. Nothing in the record indicates that the plaintiff "was unable to adequately present [his] evidence in writing or that [he]

would have been able to make different or more persuasive arguments at an oral hearing." *Id.* at 320.  Thus, the Court concludes that the plaintiff has had "notice and an opportunity to be heard."  *Id.*; *cf. Schelske v. Austin*, No. 6:22-CV-049-H, 2023 WL 5986462, at *7 (N.D. Tex. Sept. 14, 2023).

        **ii.**     **Rule 12(b)(6)**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter which, when taken as true, states 'a claim to relief that is plausible on its face.'"  *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In other words, the plaintiff must plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If a complaint pleads facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

Under Rule 12(b)(6), the Court is limited to considering "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Innova Hosp.*, 892 F.3d at 726 (internal quotation marks omitted) (quoting *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011)).  Although the Court must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff," *Lane*, 529 F.3d at 557, it should not "accept as true

conclusory allegations, unwarranted factual inferences, or legal conclusions," *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" for purposes of stating a plausible claim to relief. *Iqbal*, 556 U.S. at 678. This analysis is a "context-specific task," and the Court should "draw on its judicial experience and common sense." *Id.* at 679.

**B.    Analysis**

The Court dismisses as moot the race-discrimination claims for prospective declaratory and injunctive relief against the UT defendants, in light of *SFFA* and the repeal of Regents' Rule 40304. However, the Court finds that the plaintiff has sufficiently established his standing for and stated a claim as to his remaining race-based claims, because he has plausibly alleged that the defendants used race-based admissions preferences. Accordingly, his Title VI, Section 1981, and race-based Equal Protection claims survive against all Tech defendants, and his Title VI claim for damages survives against the institutional UT defendants. But the Court dismisses the plaintiff's Title IX claim and sex-based Equal Protection claim for lack of standing and failure to state a claim because he has failed to plausibly allege that the defendants used sex preferences in admissions, which results in the total dismissal of the individual UT defendants.

**i.    The plaintiff's race-discrimination claims for prospective relief are moot as to the UT defendants.**

The Court first addresses a Rule 12(b)(1) challenge to subject-matter jurisdiction before addressing any attack on the merits, *Ramming*, 281 F.3d at 161, and it may "address jurisdictional issues in any order [it] choose[s]," *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 4 (2023). UT argues that the race-discrimination claims for prospective declaratory and

injunctive relief are now moot after *SFFA*[5] and the repeal of Regents' Rule 40304.  Dkt. No. 35 at 12–14.  UT asserts that the Rule was the only policy allowing the defendant medical schools to consider race in admissions and that, after its repeal, the medical schools cannot and will no longer use race as a factor in admissions decisions.  *Id.*; Dkt. No. 50 at 4–8.  The UT defendants, as government actors, receive a presumption of good faith under Fifth Circuit precedent, and they have demonstrated a formalized policy change, so the Court concludes that the claims against them are moot.

Article III limits the power of the federal judiciary to "Cases" and "Controversies." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013); U.S. Const. art. III, § 2.  Thus, for a federal court to have jurisdiction, "an 'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation."  *Already, LLC*, 568 U.S. at 90–91 (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009)).  A case becomes moot and a court lacks jurisdiction "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Id.* at 91 (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)).  Accordingly, "any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot."  *Freedom From Religion Found. v. Abbott* (*Abbott II*), 58 F.4th 824, 831–32 (5th Cir. 2023) (quoting *DeOtte v. Nevada*, 20 F.4th

---

[5] Tech has also pointed to *SFFA* and argued that "[i]t is difficult to perceive what further relief Stewart expects from this Court beyond what the Supreme Court has provided."  Dkt. No. 33 at 10 n.1 (quoting *SFFA*, 600 U.S. at 231).  Insofar as this is an argument as to potential mootness, Tech "bears the burden to establish that a once-live case has become moot."  *West Virginia v. EPA*, 597 U.S. 697, 719 (2022).  However, Tech makes no real attempt to do so.  It does not present any arguments or evidence regarding its compliance with *SFFA*, such as changes to its admissions policies in the wake of that decision that would prohibit the use of race in future admissions cycles. *See generally* Dkt. Nos. 33; 49.  Perhaps it will do so later in this litigation or prove that no changes were necessary.  But, at this point, it has presented no evidence or argument.  Thus, Tech has failed to meet its burden, and the Court finds that the claims against it are not moot.

1055, 1064 (5th Cir. 2021)).  A case also becomes moot "if 'it is impossible for a court to grant any effectual relief whatever to the prevailing party.'"  *Texas v. Biden*, 20 F.4th 928, 958 (5th Cir. 2021) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022).  Thus, a claim for injunctive relief is moot if a "policy change . . . gave the plaintiffs 'the precise relief [they had] requested,' leaving the injunction with no work to do."  *Id.* at 960 (second alteration in original) (quoting *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1526 (2020)).  And a claim for declaratory relief "may sustain a suit only when the claims challenge some ongoing policy rather than merely attacking an isolated action."  *Harris v. City of Houston*, 151 F.3d 186, 191 n.5 (5th Cir. 1998) (cleaned up) (quoting *City of Houston v. HUD*, 24 F.3d 1421, 1429 (D.C. Cir. 1994)).

Here, the plaintiff seeks declaratory relief that "each of the defendants is violating Title VI and Title IX" and that "the individual defendants . . . are violating 42 U.S.C. § 1981(a) and the Equal Protection Clause by discriminating in favor of women and non-Asian racial minorities in student admissions."  Dkt. No. 1 ¶ 86.  He also asks the Court to "permanently enjoin the defendants from considering race or sex in student admissions." *Id.*  UT argues that the plaintiff's race-discrimination claims for prospective declaratory and injunctive relief are moot in light of the repeal of the Rule.  Dkt. No. 35 at 12–14.  Because UT has met its burden of showing that the UT defendants no longer consider race in admissions, even under the voluntary-cessation standard, the Court agrees.

    a.    **The Court presumes that UT voluntarily repealed the Rule.**

First, the Court treats the repeal of the Rule as a voluntary act.  Under the voluntary-cessation exception to mootness, "a defendant's voluntary cessation of a challenged practice

does not deprive a federal court of its power to determine the legality of that practice."
*Abbott II*, 58 F.4th at 833 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167, 189 (2000)).  In other words, "a defendant cannot automatically moot a case
simply by ending its unlawful conduct once sued."  *Already, LLC*, 568 U.S. at 91.
"Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case
declared moot, then pick up where he left off, repeating this cycle until he achieves all his
unlawful ends."  *Id.*

Thus, although the burden of proof is on the plaintiff to establish subject-matter
jurisdiction, *Ramming*, 281 F.3d at 161, "a defendant claiming that its voluntary compliance
moots a case bears the formidable burden of showing that it is absolutely clear the allegedly
wrongful behavior could not reasonably be expected to recur," *Already, LLC*, 568 U.S. at 91
(quoting *Friends of the Earth, Inc.*, 528 U.S. at 190); *see also Kovac v. Wray*, 449 F. Supp. 3d
649, 653 (N.D. Tex. 2020) ("Defendants retain [the] burden to establish mootness when the
defendants voluntarily cease the conduct that the plaintiff is challenging.").  This doctrine
"evaluates the risk that a defendant is engaging in 'litigation posturing' to avoid judicial
review."  *U.S. Navy Seals 1–26 v. Biden*, 72 F.4th 666, 673 (5th Cir. 2023) (quoting *Yarls v.
Bunton*, 905 F.3d 905, 910 (5th Cir. 2018)).

Here, the parties dispute whether the repeal of the Regents' Rule was "voluntary."
The plaintiff argues that this is "a post-filing change in a defendant's behavior" that falls into
the voluntary-cessation exception to mootness.  Dkt. No. 44 at 6.  However, UT argues that
the Board of Regents "repealed Rule 40304 not voluntarily, but in response to the Supreme
Court's binding decision in *SFFA*."  Dkt. No. 50 at 7 (emphasis omitted).  It asserts that

because the Rule was repealed "to ensure that UT System institutions complied with the
law," the voluntary-cessation exception does not apply.  *Id.*

The Court treats the repeal of the Rule as voluntary and proceeds to the voluntary-
cessation analysis.  A defendant's actions in accordance with new legislation or under
"compulsion of an enforcement action or judicial order" are deemed involuntary.  *Fontenot
v. McCraw*, 777 F.3d 741, 747 n.9 (5th Cir. 2015) (citing *Env't Conservation Org. v. City of
Dallas*, 529 F.3d 519, 528 (5th Cir. 2008)); *accord. Daves v. Dallas County*, 64 F.4th 616,
633–34 (5th Cir. 2023) (en banc).  However, the Fifth Circuit has previously analyzed a
defendant's compliance with new binding precedent under the voluntary-cessation
framework.  In *Boudreaux v. Louisiana State Bar Association*, "[i]n response to" new Fifth
Circuit precedent, the defendant "changed its internal policies and stopped almost all of its
[challenged] legislative activity."  86 F.4th 620, 624 (5th Cir. 2023).  In its mootness
analysis, the Fifth Circuit recounted those changes, noting that the changes were made "to
accord with" that new precedent, and observed that "voluntary cessation does not normally
moot a case."  *Id.* at 630.  The court then proceeded with the voluntary-cessation analysis
and found that the case was not moot because the defendant was a government actor
entitled to a presumption of good faith.  *Id.*  Thus, the court treated the defendant's
compliance with new case law as voluntary, not involuntary.  The Court does the same
here.  Further, because UT meets its burden of showing mootness even under the
heightened voluntary-cessation burden, *see infra* Section 2.B.i.c, the Court assumes *arguendo*
that the burden applies and proceeds with the analysis.

> **b.** **Under Fifth Circuit precedent, the UT defendants receive the government-actor presumption of good faith.**

Next, the Court concludes that in this case, the UT defendants are government actors entitled to a presumption of good faith in the voluntary-cessation framework. Although defendants still bear the burden of showing mootness based on voluntary cessation, government actors receive "some solicitude" in this analysis. *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011). "[G]overnment actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties." *Id.* Under this presumption, "[w]ithout evidence to the contrary, [courts] assume that formally announced changes to official government policy are not mere litigation posturing." *Id.* As a result, government defendants have a "lighter burden" to show that a case is moot. *Id.* Unless there is "evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct," a government defendant does not have to show a "physical or logical impossibility that the challenged policy will be reenacted." *Id.*

Here, it is not disputed that the UT defendants are state government actors. And while the Fifth Circuit has not definitively addressed whether public universities are entitled to the good-faith presumption, *see Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) (assuming *arguendo* that the good-faith presumption applied "for purposes of th[e] case"), the Court finds that it is applicable here. For one, *Fenves* arose in the "fact-specific context" of university speech codes and "a sudden change of heart, during litigation." *Abbott II*, 58 F.4th at 835 n.7 (quoting *Fenves*, 979 F.3d at 328). Here, however, the repeal of the Regents' Rule was not "a sudden change of heart," but a direct response to a change in the law. *See* Dkt. No. 35-1 at 5. As such, there are fewer concerns that UT's voluntary

– 17 –

cessation may be "a sham for continuing possibly unlawful conduct" or avoiding litigation. *Sossamon*, 560 F.3d at 325.

Moreover, in *Fenves*, the Fifth Circuit also found that the three factors that could overcome the government actor's good-faith presumption were present: (1) an "absence of a controlling statement of future intention" to not repeat the challenged conduct; (2) "suspicious timing of the change"; and (3) the defendant's continued defense of its original policies.  979 F.3d at 328–29.  Here, while UT does defend its past admissions policies, *see* Dkt. Nos. 35 at 21; 50 at 9–10, the other two factors point away from litigation posturing.  The defendants have presented a sworn statement by UT Galveston's Assistant Dean for Admissions and Recruitment that "race is not a consideration for admissions in the 2024 admissions cycle to the medical school or going forward."  Dkt. No. 35-1 at 3.[6]  In addition, the Rule authorizing affirmative-action programs was formally repealed, and the language used in the minutes documenting the repeal indicate that it was done to comply with *SFFA*.  *Id.* at 4–5.  This points to a lower risk of a return to the old policies, as long as *SFFA* is the law of the land.  And as to the second factor, the Rule was repealed in August 2023, about seven months after this case was filed and about two months after *SFFA* was decided.  *See* Dkt. Nos. 1; 35-1 at 4–6.  The distance from the filing of the complaint but the proximity to *SFFA* gives credence to the claim that the repeal was done not to escape litigation but to comply with new Supreme Court authority.

Thus, there are very few indicators that this case is like *Fenves*, where the university appeared to be trying to moot out the litigation and potentially resume its old policies.  The

---

[6] However, it is unclear how much control the Assistant Dean has over his school's admissions policies.  *See Fenves*, 979 F.3d at 328–29 (requiring "sworn testimony" from a person with "control over whether the University will reimplement the challenged definitions" (quotation omitted)).

three factors that would defeat the good-faith presumption are not all present here.  And the record does not evince signs of gamesmanship, litigation posturing, or bad faith by the UT defendants.  *Cf. U.S. Navy Seals 1–26*, 72 F.4th at 674–75, 675 n.8.  As a result, under these facts, the Court concludes that UT defendants are government actors entitled to a presumption of good faith in the voluntary-cessation analysis.

### c.   UT has met its burden of showing that the challenged behavior cannot be reasonably expected to recur.

Finally, the Court concludes that the UT defendants have met their burden to show that the alleged affirmative-action policies "cannot 'reasonably be expected to recur.'"  *See Sossamon*, 560 F.3d at 325 (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189).  When the good-faith presumption accorded to government actors applies, the Court may "assume that formally announced changes to official governmental policy are not mere litigation posturing," absent "evidence to the contrary."  *Id.*  And a government defendant does not have to show a "physical or logical impossibility that the challenged policy will be reenacted," as long as there is no "evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct."  *Id.*

For example, in *Sossamon*, the defendant met its mootness burden when the director of the Correctional Institutes Division of the Texas Department of Criminal Justice submitted an affidavit certifying that Texas had ended the challenged policy.  *Id.* at 322, 324–25.  Similarly, in *Boudreaux*, the defendant bar association "changed its bylaws and procedures to accord with" new binding precedent, incorporating a rule "prohibit[ing] [the defendant] from engaging in" the challenged conduct. 86 F.4th at 630.  In *U.S. Navy Seals 1–26*, the Navy rescinded its vaccine mandate, revoked implementing policies, and promulgated new policies stating that no vaccine mandate would be imposed on

servicemembers.  72 F.4th at 672.  However, in *Freedom From Religion Foundation v. Abbott* (*Abbott I*), mere "arguments through counsel that [the defendants'] behavior will change," although treated as good-faith representations, were insufficient because the defendants did not retract a prior statement that they would continue denying the applications at issue in the case.  955 F.3d 417, 425 (5th Cir. 2020).  In sum, "the government defendants bear the burden—a modified, lighter burden, but a burden nonetheless—to make it 'absolutely clear' that" their challenged conduct will not resume, so they must present some evidence beyond mere argument.  *Kovac*, 449 F. Supp. 3d at 654 (quoting *Sossamon*, 560 F.3d at 325).

The Court concludes that the repeal of Regents' Rule 40304 constitutes such a "formally announced change[] to official government policy."  *Sossamon*, 560 F.3d at 325. Rule 40304 "authorized" UT institutions "to develop and propose plans regarding whether to consider an applicant's race and ethnicity, as part of the institution's admissions or financial assistance policies, in accordance with" then-existing Supreme Court precedent. Dkt. No. 35-1 at 7.  However, because *SFFA* "prohibit[s] the use of an applicant's race as a factor in student admissions," the Board "[a]ccordingly . . . deleted" the Rule.  *Id.* at 5.[7]

UT argues that the repeal of the Rule "eliminated the ability of . . . the UT Medical Schools[] to consider race in admissions."  Dkt. No. 35 at 12.  UT reasons that because the Rule was "the only rule that allowed UT System institutions to consider race in admissions," after that authority was repealed, "none of the UT System medical schools

---

[7] *Compare* Univ. of Tex. Sys. Regents' *Rules and Regulations*, Rule 40304 (July 11, 2023), https://utsystem.edu/sites/default/files/offices/board-of-regents/files/historical-regents-rules-regulations/RulesComplete7-11-2023.pdf [https://perma.cc/UCR3-4SPG], *with* Univ. of Tex. Sys. Regents' *Rules and Regulations*, Rules 40303–40305 (Sept. 18, 2023), https://utsystem.edu/sites/default/files/offices/board-of-regents/files/historical-regents-rules-regulations/RulesComplete9-18-2023.pdf [https://perma.cc/GP3E-W52S].

may lawfully consider race as a factor in the admissions process going forward." Dkt. No. 50 at 5. In response, the plaintiff points out that "[t]he Board of Regents has not adopted a rule that bans consideration of race, or that forbids application forms to ask about a student's race." Dkt. No. 44 at 4. He also notes that "the UT defendants have not produced affidavits or evidence showing that each of the UT medical schools will stop considering or using race in student admissions." *Id.* at 4–5. Indeed, only UT Galveston has produced an affidavit stating that "race is not a consideration for admissions in the 2024 admissions cycle to the medical school or going forward." Dkt. No. 35-1 at 3.

Here, it is logical to conclude that the repeal of a rule authorizing the limited use of race in admissions means that race can no longer be used at all. The minutes reflect the Board's understanding that *SFFA* "prohibit[s] the use of an applicant's race as a factor in student admissions," and the Rule "allowing plans that consider an applicant's race or ethnicity" was "[a]ccordingly . . . deleted," "as necessary to comply" with *SFFA*. Dkt. No. 35-1 at 5. Thus, it is clear that the Board believed that repealing the Rule would bring UT into compliance with *SFFA* by prohibiting the consideration of race. This is comparable to the state bar association in *Boudreaux* amending its internal policies to align with new precedent. *See* 86 F.4th at 630. Rescinding an organization's authority to consider race is also similar to a military branch rescinding a vaccine requirement—the rescission returns to the baseline of no authorization to consider race and no vaccine requirement. *See U.S. Navy Seals 1–26*, 72 F.4th at 672. Further, the Board is the key governing body of the UT system; its rules are binding on the institutions in that system and have the force of statutory law. *See* Tex. Educ. Code Ann. §§ 51.352, 65.11, 65.31; *Univ. of Hous. v. Barth*, 403 S.W.3d 851, 855 (Tex. 2013). If a UT medical school implemented an affirmative-action policy today, it

would do so in defiance of its governing body's understanding of *SFFA*.  Finally, *SFFA* remains the law of the land, and there is no indication that the Rule will be reenacted if the claims against UT are mooted.  Thus, there are additional reassurances that the defendants will not return to their old policies.  *Cf. Env't Conservation Org.*, 529 F.3d at 528 (noting that due to a consent decree and the actions of third parties, the court "would not be relying solely on the [defendant's] assurances that it will not 'return to [its] old ways'" (second alteration in original) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953))).

The Court thus finds that the repeal of the Rule makes it sufficiently clear that UT's challenged conduct will not resume, even without an express prohibition on the use of race in admissions.  The Fifth Circuit has noted that when the government good-faith presumption applies and the repeal of a policy has been finalized, a controlling statement of future intention not to repeat the challenged conduct is not necessary.  *Abbott II*, 58 F.4th at 834, 835 n.7.  Both of those factors apply here.  UT also points to Regents' Rule 10701, which was amended after *SFFA* and states:

> To the extent provided by applicable law, no person shall be excluded from participation in, denied the benefits of, or subject to discrimination under, any program or activity sponsored or conducted by the University of Texas System or any of the institutions, on the basis of race, color, national origin, ethnicity, religion, sex, age, veteran status, or disability.

Dkt. No. 35-1 at 4.  Admittedly, under prior versions of the rules, UT did allow affirmative-action programs despite the language of Rule 10701 prohibiting discrimination based on race.  *See* Univ. of Tex. Sys. Regents' *Rules and Regulations*, Rules 10701, 40304 (July 11, 2023), https://perma.cc/UCR3-4SPG.  However, *SFFA* has changed the "applicable law." There, the Supreme Court held that "race-based admissions programs in which some students may obtain preferences on the basis of race alone" use race as a negative and rely

on impermissible stereotypes, and it concluded that a "student must be treated based on his or her experiences as an individual—not on the basis of race." *SFFA*, 600 U.S. at 218–20, 231.  Thus, the combination of the repeal of Rule 40304 and the change in the understanding of the "applicable law" under Rule 10701 make it sufficiently clear that the UT defendants cannot discriminate against applicants for admission on the basis of race.

In addition, although the defendants have the burden to show that the case is moot, the plaintiff has failed to submit any evidence that there is a live controversy.  He argues that "[i]t remains possible for UT institutions to continue using racial preferences despite the repeal of Regents' Rule 4030[4], just as they used racial preferences before the rule existed." Dkt. No. 44 at 4.  This suggests that the Rule was not in fact the only authorization for affirmative-action policies.  However, because the UT defendants are entitled to a presumption of good faith, mere speculation about whether they will still consider race is "insufficient to satisfy the voluntary-cessation exception." *Abbott II*, 58 F.4th at 834.  And the allegations that UT considered race in the past and under a different legal framework do not create a reasonable inference that it continues to do so now, given the change in binding Supreme Court precedent regarding the consideration of race in admissions and in the face of UT's evidence otherwise.  *See Env't Conservation Org.*, 529 F.3d at 529 (declining to draw an inference that the alleged violations would continue absent "a poor 'track record for complying with [state agency] compliance orders'" (alteration in original) (quotation omitted)).  If it is later discovered that the UT defendants have returned to their old ways, the plaintiff may file a suit seeking relief at that time.  But at this time, the plaintiff's concerns are too speculative.

In conclusion, several factors point towards mootness here.  First, this does not appear to be the kind of voluntary policy change that the voluntary-cessation doctrine targets.  The repeal of the Rule was done to comply with the law after *SFFA*—not so the defendants could moot out this case and then resume their old policies.  There is no indication of litigation posturing or gamesmanship.  *See U.S. Navy Seals 1–26*, 72 F.4th at 674–75.  Second, the Court need not rely only on mere arguments in briefing because the Board has formalized its policy change by rescinding the Rule.  Third, the plaintiff has not presented any evidence that the UT defendants are still considering race in admissions.

Thus, the Court finds that UT has made it sufficiently clear that its affirmative-action policies will not recur.  The plaintiff's race-discrimination claims for prospective declaratory and injunctive relief against the UT defendants are dismissed without prejudice under Rule 12(b)(1).[8]  However, his race-discrimination claims for damages against the institutional UT defendants and his sex-discrimination claims for all relief against all UT defendants survive at this point.  *See* Dkt. Nos. 1 ¶¶ 60–86; 44 at 7.

### ii.   The plaintiff has established his standing for his remaining race-based claims, but not his sex-based claims.

Next, the Court finds that the plaintiff's factual allegations demonstrate each element of standing for his surviving race-based claims, but not for his sex-based claims.  The doctrine of standing is "an essential and unchanging part" of the Article III case-or-controversy requirement.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); U.S. Const. art.

---

[8] The "general rule of mootness . . . is that a class action becomes moot when the putative representative plaintiff's claim has been rendered moot before a class is certified."  *Fontenot*, 777 F.3d at 748.  The plaintiff only seeks "final injunctive relief or corresponding declaratory relief" for the class.  Dkt. No. 1 ¶ 59; *see* Fed. R. Civ. P. 23(b)(2).  Thus, class relief against UT is moot.  However, class relief may be available against Tech.

III, § 2.  Thus, to establish the Court's jurisdiction, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The plaintiff "bears the burden of establishing standing as of the time he brought this lawsuit."  *Carney v. Adams*, 592 U.S. 53, 59 (2020).  Accordingly, "at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element."  *Spokeo, Inc.*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  And because "standing is not dispensed in gross," plaintiffs must also "demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  When analyzing standing, "a federal court must assume *arguendo* the merits of [the plaintiff's] legal claim."  *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) (quoting *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007)); *FEC v. Cruz*, 596 U.S. 289, 298 (2022).

"First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (cleaned up) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  Second, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id.* (cleaned up) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).  And third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at 561 (cleaned up) (quoting *Simon*, 426 U.S. at 38).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] 'presum[es]

that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *see also Hotze v. Burwell*, 784 F.3d 984, 992 (5th Cir. 2015).  Thus, a court should not "dismiss for lack of standing if [it] reasonably can infer from the plaintiff['s] general allegations that [he] has suffered an injury-in-fact." *Hotze*, 784 F.3d at 992.  However, "standing is not created by a declaration in court pleadings," so the plaintiff still must clearly allege facts demonstrating his standing. *Id.* at 992–93 (quoting *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011).

Here, the plaintiff has alleged that the defendants "provid[ed] admissions preferences to female, black, and Hispanic applicants."  Dkt. No. 1 ¶ 48.  He alleges that they did so by "allow[ing] applicants with inferior academic credentials to obtain admission at the expense of rejected candidates with better academic credentials." *Id.* ¶ 33.  He alleges that, based on the schools' own admissions data, "over 450 lesser qualified minority students, ranging as low as a GPA of 2.82 or an MCAT of 495, were offered admission," while he was denied admission with a 3.96 GPA and a 511 MCAT score. *Id.* ¶¶ 36–37.  Next, the plaintiff alleges that these "race and sex preferences that the defendants have established and enforce prevent [him] from competing on equal terms with other applicants for admission to these medical schools because [he] is a white male." *Id.* ¶ 51.  Finally, he alleges that he "intends to reapply to each of the six defendant medical schools" and "stands 'able and ready' to do so." *Id.* ¶ 50.

Although these are admittedly general allegations of injury, at the pleading stage, they are sufficient for standing on the plaintiff's race-based claims. *See Lujan*, 504 U.S. at 561.  Contrary to Tech's assertion otherwise, these particular allegations are factual

allegations, not legal conclusions. *See* Dkt. No. 49 at 4. Whether the defendants gave admissions preferences to female, black, and Hispanic applicants—i.e., preferred to admit certain applicants over others based on those applicants' race or sex—is an issue of fact. And, as discussed below,[9] the plaintiff has plausibly alleged that the defendants used race-based preferences because his alleged statistics raise a reasonable inference that the schools held applicants to different academic standards based on their race. *See infra* Section 2.B.iii.a.

Indeed, the Fifth Circuit has recently confirmed that such allegations are sufficient to establish standing. *See Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1086 (5th Cir. 2022). The court observed that the key for injury-in-fact in this context is "whether [the plaintiff] has adequately alleged that [the school's] race-conscious policy puts [white applicants] on unequal footing with other applicants based on race." *Id.* The plaintiff has done so here. His alleged injury is that he was "denied the 'opportunity to compete for admission on an equal basis'"—not his denial from the medical schools, as Tech claims. *See id.* (quoting *Gratz*, 539 U.S. at 262); Dkt. Nos. 1 ¶¶ 50–51; 33 at 9, 14. And as alleged, the plaintiff has already suffered this unequal treatment when he applied to the medical schools, and he will suffer it in the future if he reapplies under these policies, thus establishing standing on his race-based claims for damages against Tech and UT and

---

[9] The Supreme Court has noted that if "a plaintiff fails to plausibly allege an element that is both a merit element of a claim and a jurisdictional element, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6). Or both." *Brownback v. King*, 592 U.S. 209, 218 n.8 (2021). Accordingly, to the extent that Tech's standing arguments and UT's *Ex parte Young* arguments actually challenge the plausibility and sufficiency of the plaintiff's factual allegations under Rule 12(b)(6), *see* Dkt. Nos. 33 at 9–14; 35 at 18; 50 at 9, the Court addresses them as such. *See also Williamson*, 645 F.2d at 415 (noting that courts generally "refus[e] to treat indirect attacks on the merits as Rule 12(b)(1) motions," because "no purpose is served by indirectly arguing the merits in the context of federal jurisdiction").

for prospective relief against Tech.  Dkt. No. 1 ¶¶ 36, 50–51; *see Univ. of Tex.*, 37 F.4th at 1086.

The same is not true for his allegations of sex-based admissions preferences, however.  As detailed below, the plaintiff's allegations reflect only small differences in academic qualifications between the two sexes, which do not create a reasonable inference that men and women were held to different standards in the admissions process.  *See infra* Section 2.B.iii.b.  Because the plaintiff has failed to sufficiently allege that he was treated unequally because of his sex, he has failed to allege an injury-in-fact and lacks standing for his sex-discrimination claims.

Once injury-in-fact is established as to the plaintiff's race-based claims, the remaining elements of standing fall into place.  *Cf. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 n.5 (1993).  For traceability, the plaintiff has alleged that his injury—unequal treatment based on his race—was caused by the defendants' challenged action—giving admissions preferences to some applicants based on race.  *See* Dkt. No. 1 ¶¶ 51–52; *Lujan*, 504 U.S. at 560.  This injury also appears to be "fairly traceable" to the defendants named.[10]  The plaintiff has sued the president, dean, and admissions directors or deans at each medical school in their official capacities.  *See* Dkt. No. 1 ¶¶ 4–32.  While the plaintiff does not clearly allege what role those officials play in

---

[10] For the same reason, the Court rejects UT's argument that the individual defendants are not the proper defendants under *Ex parte Young*.  *See* Dkt. No. 35 at 16, 18.  "Under *Ex parte Young*, the officers who are sued must have 'some connection with the enforcement' of the challenged law or policy."  *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).  This requires at least a "scintilla of 'enforcement,'" and "a supervisory role over the individuals who were allegedly violating constitutional rights" will suffice.  *Id.* at 367–68 (quotation omitted).  It is a reasonable inference that the president, dean, and chief admissions officials at a medical school would have some enforcement of the admissions policies and a supervisory role over individual admissions officers.

setting admissions policies, the Court reasonably infers based on their titles that those officials have some authority or control over the admissions policies.

Similarly, for redressability, the plaintiff has alleged that the injury of unequal treatment based on race "will be redressed by a declaratory judgment and injunction that bars the defendants from considering or discriminating on account of race . . . when admitting students to the medical schools." Dkt. No. 1 ¶¶ 51–52. The logic here is obvious—unequal treatment under a certain policy is redressed by equitable relief directing the defendants to discontinue that policy. *See Ne. Fla. Chapter*, 508 U.S. at 666 n.5. And his past injury is redressable by nominal or compensatory damages. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021); *see* Dkt. No. 1 ¶ 86. The plaintiff does not have to allege that he was denied admission specifically because of his race or that removing the preferences would result in his admission. *See* Dkt. No. 33 at 9, 14. Instead, he need only allege that he was unable to compete on a level playing field and that relief from this Court could level that field and compensate him. He has done so here.

In sum, the Court finds that the plaintiff has sufficiently alleged an injury of unequal treatment based on his race that is traceable to the defendants' admissions preferences and redressable by damages and by an injunction prohibiting the defendants from considering race. Thus, the plaintiff has sufficiently pled all three elements of standing for his remaining race-based claims. However, as discussed in detail below, the plaintiff has not plausibly alleged unequal treatment based on his sex, so he has failed to establish his standing as to his sex-based claims.

### iii. The plaintiff has plausibly alleged race-discrimination claims, but he has not plausibly alleged sex-discrimination claims.

Next, the Court finds that the plaintiff has plausibly alleged facts that state a claim upon which relief may be granted as to his race-discrimination claims. His factual allegations that the defendant medical schools gave admissions preferences to black and Hispanic applicants are made plausible by his cited statistics. However, the Court finds that the plaintiff has not sufficiently alleged that the defendants gave admissions preferences based on sex, and it dismisses his Title IX claim and his sex-based Equal Protection claim.

### a. The plaintiff's factual allegations make his claim of intentional race discrimination plausible.

The Court concludes that the plaintiff's factual allegations state a claim of racial discrimination. To state a claim under Title VI, Section 1981, and the Equal Protection Clause, a plaintiff must allege intentional discrimination based on race. *See Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001) (Title VI); *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982) (Section 1981); *Vill. of Arlington Heights v. Metro Hous. Dev.*, 429 U.S. 252, 265 (1977) (Equal Protection Clause).[11] Tech and UT both argue that the plaintiff has failed to do so. Tech argues that the disparity in MCAT scores does not create an inference that Tech considered race or sex in admissions at all. Dkt. No. 33 at 9–16. And UT argues that the plaintiff's statistics do not plausibly show that the discrimination was intentional. Dkt. No. 35 at 19–21. For the reasons stated below, the Court disagrees as to the race-discrimination claims.

---

[11] The Supreme Court has also held that intentional discrimination that violates the Equal Protection Clause also violates Title VI and Section 1981. *Gratz*, 539 U.S. at 276 n.23; *see also SFFA*, 600 U.S. at 198 n.2.

The plaintiff has pled enough facts to make it plausible that the defendants used race-based admissions preferences, thus stating a race-discrimination claim. Again, he alleges that the defendants' discriminatory preferences consist of allowing non-Asian minorities to be admitted with lower academic credentials. Dkt. No. 1 ¶ 33. Specifically, the plaintiff cites "data reveal[ing] that the median and mean grade-point averages and MCAT scores of admitted black and Hispanic students are significantly lower than the grade-point averages and MCAT scores of admitted white and Asian students." *Id.* ¶ 38. At Texas Tech, he alleges, "blacks and Hispanics are admitted with much lower MCAT scores than whites or Asians." *Id.* ¶ 41. And he alleges that he applied to the defendant medical schools and was rejected, "while over 450 lesser qualified minority students, ranging as low as a GPA of 2.82 or an MCAT of 495, were offered admission." *Id.* ¶ 36. In other words, he claims that black and Hispanic applicants were held to different academic standards than white and Asian applicants.

The statistics and facts alleged in the complaint bear this out. For example, the plaintiff provides the following graph of MCAT scores of students admitted to Tech's medical school, divided by race[12]:

---

[12] The boxes represent the inner-quartile range (25th to 75th percentiles), and the solid black line represents the median. Dkt. No. 1 ¶ 39.



*Id.* ¶ 41.

At Tech, the median MCAT score for admitted black students was approximately

506. *Id.* In contrast, the median score for admitted white students was approximately 512,

and for admitted Asian students, it was approximately 514. *Id.* This is a 6- to 8-point

difference.[13] Further, the 75th percentile score for admitted black and Hispanic students was

the same as or only about a point above the 25th percentile score for admitted Asian

students. *Id.* The 75th percentile score for black and Hispanic students was also about a

point lower than the median score for admitted white students. *Id.* Thus, at Tech, almost

75% of admitted Asian students and 50% of admitted white students had higher MCAT

---

[13] The Court takes judicial notice that the Association of American Medical Colleges, which
administers the MCAT, reports that, under the percentile ranks in effect from May 2021 to April
2022, a score of 506 was in the 65th percentile of scores, a score of 512 was in the 84th percentile,
and a score of 514 was in the 88th percentile. *Summary of MCAT Total and Section Scores*, Ass'n of
Am. Med. Colls., https://students-residents.aamc.org/media/11881/download
[https://perma.cc/V3VD-ZUXF].

scores than 75% of admitted black and Hispanic students.  *Id.*  And nearly 50% of admitted

Asian students had higher MCAT scores than *all* admitted black students.  *See id.*

Under the applicable standard of review, these statistics make it plausible that at least

some black and Hispanic applicants were held to lower academic standards and were

admitted despite their lower MCAT scores based on their race.  It also makes it plausible

that, conversely, white and Asian applicants had to meet higher academic standards to be

admitted.  For example, the plaintiff's MCAT score of 511 falls above the 75th percentile for

admitted black students at Tech, but it was only around the median for admitted white

students, and the plaintiff was rejected.  *See id.* ¶¶ 36, 41.  This permits a reasonable

inference that if the plaintiff had been black or Hispanic, he likely would have received a

more favorable consideration.

The gaps in median MCAT scores for admitted black and Hispanic students versus

white and Asian students is present at the UT medical schools, too.  *See generally id.* ¶¶ 39,

42, 44, 46, 47.  In addition, the 75th percentile score for admitted black students is about the

same as or several points below the 25th percentile score for admitted white and Asian

students at all of the UT medical schools.  *Id.*  Finally, the plaintiff alleges that there is "a

statistically significant relationship between a positive admissions decision and an

applicant's status" as black or Hispanic at UT Austin, Houston, and Galveston.  *Id.* ¶¶ 40,

42, 45.  At the motion-to-dismiss stage, these statistics allow a reasonable inference that

blacks and Hispanics were afforded admissions preferences that allowed them to be

admitted to the defendant medical schools despite their lower credentials because of their

race.  It also allows a reasonable inference that, because of these preferences, whites and

Asians had to meet a higher academic standard to be admitted—several MCAT points higher.

This inference is reasonable despite the potential influence of other admissions factors.  Tech points out that under the Texas Education Code, graduate schools may consider many non-academic factors, and a medical school "*may not* make an admission decision based simply on an applicant's MCAT score."  Dkt. No. 33 at 12 (emphasis in original) (citing Tex. Educ. Code Ann. § 51.842(b)).[14]  Thus, Tech argues that it must consider other factors and cannot simply admit the highest MCAT scorers, so the scores are distributed.  *Id.* at 14.  It is true that "statistical data cannot meet [the Rule 8(a)] pleading requirements if, among other possible issues, it is also consistent with a legal and obvious alternative explanation."  *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892, 898 (5th Cir. 2020).

But the plaintiff alleges that admitted black and Hispanic students also had significantly lower GPAs than admitted white and Asian students.  Dkt. No. 1 ¶ 38.  The fact that these minority applicants are admitted despite having much lower MCATs and much lower GPAs makes it plausible that they are receiving preferential treatment, while whites and Asians are being held to higher academic standards.  In addition, it seems unlikely that non-academic factors would make up for such a large gap in scores between the racial groups.  Again, 75% of black students were admitted to Tech with scores lower than 75% of Asians and about 50% of whites.  *See id.* ¶ 41.  Thus, the Court concludes the

---

[14] When considering a Rule 12(b)(6) motion, the Court may consider matters of which it may take judicial notice, such as Texas law.  *Innova Hosp.*, 892 F.3d at 726; *United States v. White*, 258 F.3d 374, 382 n.9 (5th Cir. 2001).

plaintiff's alleged statistics are not consistent with an alternative explanation of non-academic factors, and they instead point to the plausibility of his race-discrimination claim.

Moreover, the plaintiff's allegations regarding racial discrimination have sufficiently stated a claim of intentional discrimination. UT argues that the plaintiff has not plausibly alleged intentional discrimination based on race, claiming that he has not "allege[d] *any* facts about whether the UT Defendants adopted a policy or took any action *because of* its effects on identifiable groups." Dkt. Nos. 50 at 9 (emphasis in original); 35 at 19.

However, the plaintiff has alleged that "the defendants have established and enforce" racial preferences in admissions. Dkt. No. 1 ¶ 51. This creates a reasonable inference that the preferences were intentional. And these preferences consist of allowing black and Hispanic "applicants with inferior academic credentials to obtain admission at the expense of rejected [white and Asian] candidates with better academic credentials." *Id.* ¶ 33. In other words, the plaintiff has alleged that the medical schools intentionally put into place and upheld admissions practices that make it easier for certain applicants to be admitted if they were black or Hispanic, but do not give whites or Asians the same preferences. *See id.* ¶¶ 48, 51. The only logical inference is that the defendants used these practices because of their effects on black and Hispanic applicants. And in a "zero-sum" admissions system, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218–19. Thus, the Court finds that the plaintiff has plausibly alleged that the defendant medical schools and administrators have intentionally treated some groups worse than others based on race. *See id.*; *id.* at 294 (Gorsuch, J., concurring). This is sufficient for a claim of intentional discrimination.

Accordingly, the Court concludes that the plaintiff has plausibly alleged a claim of intentional race discrimination.  His factual allegations are sufficient to state a plausible claim to relief.

> **b.**    **The plaintiff has not plausibly alleged a claim of sex discrimination.**

The Court finds that the plaintiff has not plausibly alleged that the defendants discriminated based on sex in admissions.  Like the race-discrimination statutes, claims under Title IX and the Equal Protection Clause require an allegation of intentional discrimination based on sex.  *See Poloceno v. Dall. Indep. Sch. Dist.*, 826 F. App'x 359, 362 (5th Cir. 2020); *Cook v. Hopkins*, 795 F. App'x 906, 916 (5th Cir. 2019).  But the plaintiff's factual allegations regarding sex do not create an inference of unequal treatment.

The plaintiff's statistics reveal that there is a much smaller difference between the MCAT scores of admitted men and admitted women.  *See id.* ¶¶ 41, 43, 44, 46, 47.  As UT points out, the graphs reveal scores "near parity."  Dkt. No. 35 at 19.  For Tech and most of the UT schools, there are only 1- to 2-point gaps between the median MCAT scores of admitted men and women.  *See* Dkt. No. 1 ¶¶ 41, 43, 44, 47.  For example, the chart for Tech only shows about a 2- or 3-point shift in the distribution of men's and women's scores:



*Id.* ¶ 41.  The largest gap between the median score for men and women, at UT San Antonio, is about 3 points:



*Id.* ¶ 46.  And at UT Southwestern, the distribution of men's and women's scores are nearly identical:



*Id.* ¶ 47.

These gaps, unlike the gaps between the different races, are much easier to explain by a difference in MCAT scores between men and women in the pool of applicants or by non-academic factors.  The plaintiff does allege that, at two schools, there is a statistically significant relationship between being female and a positive admissions decision.  *Id.* ¶¶ 40, 45.  However, he has not alleged that women also had significantly lower GPAs than men. *Cf. id.* ¶ 38.  Based on the near parity in MCAT scores between the two sexes and the lack of other allegations supporting an inference that admitted women were much less academically qualified than admitted men, the Court finds that the plaintiff has only alleged the possibility of sex discrimination.

Because these allegations do not clear the plausibility threshold, the plaintiff has both failed to establish his standing and failed to state a claim under Title IX or a sex-based claim under the Equal Protection Clause, and those claims are dismissed as to all defendants.  *See Brownback*, 592 U.S. at 218 n.8.  In addition, because the plaintiff has not adequately alleged

sex-based discrimination and his race-based claims for prospective relief against UT are moot, he has not alleged "an ongoing violation of federal law" as is required for a claim for prospective relief under *Ex parte Young*.  *Freedom From Religion Found. v. Mack*, 4 F.4th 306, 311–12 (5th Cir. 2021).  Thus, the individual UT defendants retain their Eleventh Amendment immunity as to that claim.  Since the plaintiff "is asserting only *Ex parte Young* claims for prospective relief against the individual defendants," *see* Dkt. No. 44 at 7, and the prospective relief claims against the individual UT defendants are barred by mootness and immunity, the individual UT defendants are dismissed.

### iv.    The Court grants the plaintiff leave to amend his complaint.

In sum, the plaintiff's race-based claims for prospective relief against UT are dismissed as moot, and his sex-based claims against all defendants are dismissed for lack of standing and failure to state a claim.  However, his race-based claims for damages against the institutional UT defendants and for damages and injunctive relief against all Tech defendants survive.

Nevertheless, the Court notes that there is a strong policy in favor of granting leave to amend.  *See Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).  Thus, district courts often allow plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless the amendment would be futile.  *See id.* Further, dismissals on jurisdictional grounds, such mootness, are without prejudice.  *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 103 F.4th 383, 396 (5th Cir. 2024).  The plaintiff has not previously been given an opportunity to amend.  And the Court finds that an amendment would not be futile here.  The plaintiff has had the opportunity to conduct discovery and thus may be able to allege new facts that demonstrate

a live controversy as to the race-based prospective-relief claims or the existence of sex-based admissions preferences. Thus, the Court dismisses the aforementioned claims without prejudice and grants the plaintiff 14 days from the date of this Order to file a first amended complaint should he choose to do so.

**3.     Motion to Sever and Transfer**

Next, the Court finds that the UT defendants have been misjoined with the Tech defendants under Rule 20, because the plaintiff's claims against them do not arise out of the same series of transactions or occurrences. As a result, venue is no longer proper in this division for the claims against UT, and Austin is the most convenient venue for the parties. Accordingly, the remaining claims against UT are severed from the claims against Tech and transferred to the Western District of Texas, Austin Division.

**A.     Standards of Review**

**i.     Misjoinder and Motion to Sever**

Under Federal Rule of Civil Procedure 20, multiple defendants may be joined in one action if "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). "Generally, as long as both prongs of the test are met, 'permissive joinder . . . is at the option of the plaintiffs.'" *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 521 (5th Cir. 2010) (quoting *Applewhite v. Reichhold Chems., Inc.*, 67 F3d 571, 574 (5th Cir. 1995)). The Supreme Court has noted that "[u]nder the [r]ules, the impulse is towards entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties[,] and remedies is strongly encouraged." *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966).

"Misjoinder of parties is not a ground for dismissing an action."  Fed. R. Civ. P. 21.

Under Rule 21, "[o]n motion or on its own, the court may at any time, on just terms, add or

drop a party."  *Id.*  "The court may also sever any claim against a party."  *Id.*  Thus, "[i]f a

party does not meet both prongs of Rule 20," courts apply Rule 21 to remedy the

misjoinder.  *Vance v. Safety-Kleen Sys., Inc.*, No. 3:21-CV-2171-B, 2022 WL 22352487, at *2

(N.D. Tex. Oct. 7, 2022).

A Rule 21 severance "creates two separate actions or suits where previously there

was but one.  Where a single claim is severed out of a suit, it proceeds as a discrete,

independent action . . . ."  *United States v. O'Neil*, 709 F.2d 361, 368 (5th Cir. 1983).  "The

party seeking severance under Rule 21 . . . bears the burden of proving that such action is

necessary."  *Aspen Tech., Inc. v. Kunt*, No. 4:10-cv-1127, 2011 WL 86556, at *3 (S.D. Tex.

Jan. 10, 2011).

### ii.    Motion to Transfer

Venue for a civil action is proper in "(1) a judicial district in which any defendant

resides, if all defendants are residents of the State in which the district is located; [or] (2) a

judicial district in which a substantial part of the events or omissions giving rise to the claim

occurred."  28 U.S.C. § 1391(b)(1)–(2).  Even if venue is proper, under 28 U.S.C. § 1404(a),

"[f]or the convenience of parties and witnesses, in the interest of justice, a district court may

transfer any civil action to any other district or division where it might have been brought."

*Id.* § 1404(a).  Because the plaintiff's choice of venue is entitled to "appropriate deference,"

the movant must show good cause for the transfer by showing that the transferee venue is

"clearly more convenient."  *In re Volkswagen of Am., Inc.* (*Volkswagen II*), 545 F.3d 304, 315

(5th Cir. 2008) (en banc).  Courts in the Fifth Circuit consider several private and public

interest factors to determine whether a Section 1404(a) venue transfer is appropriate:

> The private interest factors are: "(1) the relative ease of access to sources
> of proof; (2) the availability of compulsory process to secure the
> attendance of witnesses; (3) the cost of attendance for willing witnesses;
> and (4) all other practical problems that make trial of a case easy,
> expeditious and inexpensive."  The public interest factors are: "(1) the
> administrative difficulties flowing from court congestion; (2) the local
> interest in having localized interests decided at home; (3) the familiarity
> of the forum with the law that will govern the case; and (4) the
> avoidance of unnecessary problems of conflict of laws [or in] the
> application of foreign law."

*Id.* (alteration in original) (internal citation omitted) (quoting *In re Volkswagen AG*

(*Volkswagen I*), 371 F.3d 201, 203 (5th Cir. 2004)).  These factors are not exhaustive or

exclusive, and no factor is given dispositive weight.  *Id.*

If venue is improper, "[t]he district court of a district in which is filed a case laying

venue in the wrong division or district shall dismiss, or if it be in the interest of justice,

transfer such case to any district or division in which it could have been brought."  28

U.S.C. § 1406(a).  If venue is proper in multiple districts, district courts in the Fifth Circuit

look to the Section 1404(a) factors to determine which forum is more convenient for

transfer.  *See CUPP Cybersecurity LLC v. Symantec Corp.*, No. 3:18-CV-01554-M, 2019 WL

1070869, at *6 (N.D. Tex. Jan. 16, 2019).  However, under Section 1406, the party seeking

transfer to a particular venue does not have to show that venue is "clearly more convenient"

than the plaintiff's chosen venue, because the plaintiff's choice was improper and thus does

not receive the same deference.  *See id.* at *7.

**B.      Analysis**

      **i.      The UT defendants are misjoined with the Tech defendants under Rule 20(a)(2) and must be severed.**

The Court concludes that Tech and UT are misjoined because the plaintiff's claims against them do not arise out of the same "series of transactions or occurrences." *See* Fed. R. Civ. P. 20(a)(2). Thus, the claims against UT are severed.

Again, to be properly joined as defendants, the plaintiff's claims against Tech and UT must "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences," and there must be at least one "question of law or fact common to all defendants." Fed. R. Civ. P. 20(a)(2); *see Acevedo*, 600 F.3d at 521. Courts in the Fifth Circuit have generally held that claims "alleg[ing] the same constitutional violations" or violations of the same statute present common questions of law. *See Battison v. City of Electra*, No. 7:01-CV-037-R, 2001 WL 497769, at *2 (N.D. Tex. May 8, 2001); *Askew v. Raytheon Co.*, No. 3:13-CV-4220-G, 2014 WL 1567916, at *8 (N.D. Tex. Apr. 17, 2014). Thus, the plaintiff argues that his claims against each defendant involve the common question of law of "[w]hether (and to what extent) race and sex preferences in student admissions are permissible under federal anti-discrimination law." Dkt. No. 45 at 7. Because the plaintiff alleges that each school's use of affirmative-action programs violates Title VI, Section 1981, and the Equal Protection Clause, *see* Dkt. No. 1 ¶¶ 60, 71, 78–80, the Court concludes that his claims present common questions of law and turns to the first prong of Rule 20(a)(2).

To determine whether claims arise out of the same transaction, occurrence, or series of occurrences, "district courts in the Fifth Circuit apply the logical relationship test." *Vance*, 2022 WL 22352487, at *3 (cleaned up) (quoting *EMET, LLC v. Johnson Controls, Inc.*,

No. SA-21-CV-00753-JKP-RBF, 2021 WL 4712694, at *5 (W.D. Tex. Oct. 7, 2021)).

Claims have a logical relationship if they "share an aggregate of operative facts," *id.*

(quoting *N.Y. Life Ins. Co. v. Deshotel*, 142 F.3d 873, 882 (5th Cir. 1998)), or "some nucleus of

operative facts or law," *Hanley v. First Invs. Corp.*, 151 F.R.D. 76, 79 (E.D. Tex. 1993).  In

addition, "[w]here a claim is based on a pattern or practice of conduct, such conduct can

constitute the 'series of transactions or occurrences' required by Rule 20(a)."  *Battison*, 2001

WL 497769, at *2.

However, "generally, it has been held that joinder will not be allowed based solely on

the assertion that the defendants committed the same type of violations in the same way."  7

Wright & Miller, *Federal Practice and Procedure* § 1653 (3d ed. June 2024).  For example,

under this principle, a district court in the Fifth Circuit has held that claims of copyright

infringement brought against many individual defendants who used a program to

simultaneously view and share the same file with other users are misjoined.  *See, e.g.*, *LFP

Internet Grp. LLC v. Does 1–3,120*, No. 3:10-cv-2095-F, 2011 WL 13253894, at *2 (N.D. Tex.

Feb. 10, 2011).  And another court has held that a prisoner who complained of the same

medical condition at multiple facilities and received the same response could not join his

claims against those institutions.  *Wilson v. Grimes*, No. 15-00680-JJB-RLB, 2017 WL

2371784, at *4–5 (M.D. La. May 31, 2017).  Courts have refused to "join defendants who

simply engaged in similar types of behavior, but who are otherwise unrelated," absent

"some allegation of concerted action," a "common policy," or a "conspiracy."  *United States

ex rel. Grynberg v. Alaskan Pipeline Co.*, No. Civ. 95-725(TFH), 1997 WL 33763820, at *1–2

(D.D.C. Mar. 27, 1997); *see also LFP Internet Grp., LLC*, 2011 WL 13253894, at *1–2.

Other district courts have severed claims against different universities when a plaintiff merely alleges that each discriminated against him in a similar way.  In *Spaeth v. Michigan State University College of Law*, the plaintiff sued six law schools and various officers alleging that they violated the Age Discrimination in Employment Act.  845 F. Supp. 2d 48, 50 (D.D.C. 2012).  He alleged that he applied for teaching positions at each school, but that each school made offers to candidates who were younger and less qualified than him.  *Id.* at 51–52.  Four of the schools moved for severance and transfer, arguing that they had been misjoined.  *Id.* at 50–51.  The district court agreed.  *Id.* at 52–53.  Applying the logical relationship test, the court found that the complaint indicated that the defendants had acted independently and that the plaintiff had not alleged any concerted action, conspiracy, or shared policy between the defendants.  *Id.* at 53–54.  Nor did the fact that the defendants were "members of a common industry" suffice to create a series of transactions or occurrences.  *Id.* at 54 (quoting *Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1078 (C.D. Cal. 2002)).  Thus, the court concluded that "other than 'the fact that [the plaintiff's] claims all arise under' the ADEA, [the plaintiff] has 'offered nothing to suggest that the claims are logically related in any way.'"  *Id.* at 53 (quoting *Davidson v. District of Columbia*, 736 F. Supp. 2d 115, 121 (D.D.C. 2010)).

Like the plaintiff's claims in *Spaeth*, the plaintiff's claims against UT and Tech are not logically related and are thus misjoined.  Each medical school has a different admissions policy, and the plaintiff has not alleged a common practice or policy applying to both groups of defendants.  Accordingly, for the following reasons, the claims against UT are severed from the claims against Tech.

First, the plaintiff's claims against UT and Tech do not share a nucleus of operative facts.  Similar to the plaintiff in *Spaeth*, the plaintiff has alleged that he applied to each defendant medical school and that each discriminated against him by giving admissions preferences to less-qualified minority applicants.  Dkt. No. 1 ¶¶ 33, 36, 48.  However, this is effectively an assertion that each school "committed the same type of violations"—discrimination based on race—"in the same way"—by giving admissions preferences.  *See* Wright & Miller, *supra*, § 1653.  This is insufficient to show that the admissions decisions were a series of transactions or occurrences.

Instead, the operative facts of the plaintiff's claims will likely be specific to each school—each school's admissions policies, how each school and/or officer considered race, and what kind of preferences they gave to minority applicants.  As UT argues, the plaintiff's "allegations recognize that each institution has its own admissions policy," such as the complaint's discussion and attachment of the "Admissions Policies & Procedures" at UT Galveston.  Dkt. No. 36 at 12; *see* Dkt. Nos. 1 ¶ 49; 1-2.  There is no indication that any schools had the same policies, weighed race in the same way, or gave the same admissions preferences.  *See* Dkt. No. 1 ¶¶ 39, 41, 42, 44, 46, 47 (reflecting different disparities between the races at the different schools).  And as a result, the plaintiff's claims against each medical school "w[ill] require a factual inquiry into each defendant's separate admissions process" and different evidence.  *See* Dkt. No. 36 at 10, 12.  Thus, the Court concludes that the plaintiff's claims against Tech and his claims against the UT schools are not based on the same nucleus of operative facts and lack a logical relationship to each other, making joinder inappropriate.

Further, the plaintiff has not alleged a common policy, pattern, or practice that would give rise to a connection between Tech and UT.  The plaintiff argues that because "all of the defendant medical schools are owned and operated by the state of Texas" and "[t]he state of Texas is ultimately responsible for the admissions policies at its state universities," the schools' policies reflect a "pattern or practice of discriminatory conduct." Dkt. No. 45 at 6–7 (quoting *Lott v. Eastman Kodak Co.*, No. 3:97-CV-2560-P, 1999 WL 242688, at *3 (N.D. Tex. Apr. 16, 1999)).  Under this argument, the claims that each state school discriminated against the plaintiff in the same way—by using race-based admissions preferences—are logically related because they reflect a common pattern or practice of discrimination by the state.  For example, in *United States v. Mississippi*, the Supreme Court held that six county registrars of voters were properly joined as defendants because the complaint had sufficiently alleged that they "had acted and were continuing to act as part of a state-wide system designed to enforce the registration laws in a way that would inevitably deprive colored people of the right to vote solely because of their color."  380 U.S. 128, 142 (1965).  There, the complaint alleged that Mississippi had passed multiple state constitutional amendments and laws imposing new voter requirements, which were enforced by registrars against black voters.  *See id.* at 131–35.

But here, UT argues that the plaintiff has not actually alleged "a 'state-wide system' or policy designed to discriminate on the basis of race," Dkt. No. 51 at 8–9 (quoting *Mississippi*, 380 U.S. at 143), and the Court concurs.  The plaintiff has not sufficiently alleged a discriminatory policy or practice by the state that applies to all of the defendants. Although the plaintiff does allege that "each of the defendant medical schools is providing admissions preferences to female, black, and Hispanic applicants" but not to "whites,

Asians, and men," Dkt. No. 1 ¶ 48, there are no facts or other allegations in the complaint indicating that this was a broader policy by the state, *see generally* Dkt. No. 1. *Cf. Amie v. City of Jennings*, No. 2:03CV2011, 2005 WL 3007009, at *1 (W.D. La. Nov. 8, 2005) (collecting cases where plaintiffs made allegations about a policy or practice). Unlike the allegations against the state government in *Mississippi*, there is no indication that Texas was enacting, promulgating, or encouraging policies that were discriminatory or would be enforced in a discriminatory manner by the state schools. There are also no allegations demonstrating similarities between Tech's and the UT schools' use of racial preferences, which could provide evidence or an inference of a common pattern or practice. *Cf. Askew*, 2014 WL 1567916, at *8. Without any allegations or indications of a discriminatory pattern or practice, the Court declines to construe the complaint so broadly as to find a state-wide discriminatory pattern.

Further, the University of Texas and Texas Tech University systems operate independently and are governed by separate Boards of Regents, which makes it much less likely that they were subject to the same policies. *See* Tex. Educ. Code Ann. § 52.352(a)(1) (noting that the governing boards of institutions of higher education are "expected to preserve institutional independence"); *id.* 65.01, 65.11, 65.31 (describing the University of Texas Board of Regents); *id.* § 109.001 (describing the Texas Tech Board of Regents). And as UT points out, the plaintiff does not allege that the UT and Tech defendants "coordinate[d] regarding admissions decisions," acted in concert, conspired together against the plaintiff, used the same decisionmakers, or shared a common policy. Dkt. Nos. 36 at 10–11; 51 at 8; *see Grynberg*, 1997 WL 33763820, at *1–2; *see generally* Dkt. No. 1. Accordingly, the Court concludes that the plaintiff's claims do not arise out of the same

series of transactions or occurrences because they are not part of a common pattern, practice, or policy.

In contrast, the claims against the UT defendants arise out of the same series of transactions or occurrences because those defendants share a common governance and were subject to at least one common policy.  The remaining UT defendants, as institutions in the University of Texas system, are all governed by the University of Texas Board of Regents.  *See* Tex. Educ. Code Ann. §§ 65.01, 65.02, 65.11.  As a result, it is much more likely that the UT medical schools were governed by common policies or practices, to which Tech was not subject.  Further, UT argues that Regents' Rule 40304 is a common policy between the UT schools that did not apply to Tech.  *See* Dkt. Nos. 36 at 10–11; 51 at 7 n.2.  The Rule "authorized" UT institutions to adopt affirmative-action plans that had to be "reviewed and approved by System Administration's Office of General Counsel, and by the appropriate Executive Vice Chancellor, prior to implementation."  Dkt. No. 36-1 at 2.  Thus, the Rule indicates a common policy of allowing affirmative action within the UT system, or a pattern or practice of alleged discrimination, justifying joinder of the UT defendants.  And each school's alleged affirmative-action policy would have been approved by at least one common entity, *see id.*, contributing to a nucleus of operative facts for the plaintiff's claims against the UT defendants.

Finally, although the Court concludes that severing UT from Tech is necessary due to misjoinder, it also notes that several practical considerations point towards discretionary severance under Rule 21 as well.  Even if parties are properly joined, a court may "refuse joinder in the interest of avoiding prejudice and delay, ensuring judicial economy, or safeguarding principles of fundamental fairness."  *Acevedo*, 600 F.3d at 521 (internal

– 49 –

citations omitted).  For example, courts may deny joinder "when it would not facilitate judicial economy and when different witnesses and documentary proof would be required for plaintiffs' claims."  *Id.* at 522.  When considering severance under Rule 21, courts consider factors including whether there are common questions of law and fact, judicial economy, and whether different witnesses and documentary proof are necessary for the different claims.  *Def. Distributed v. Bruck*, 30 F.4th 414, 431 (5th Cir. 2022).  Those factors weigh against joinder here.

First, joinder would not promote judicial economy.  The surviving claims against Tech and UT have diverged after the Court's resolution of the motions to dismiss.  *See supra* Section 2.B.iv.  All of the race-discrimination claims survive against all of the Tech defendants, but only the race-discrimination claims for damages survive against only the institutional UT defendants.  *See id.*  Thus, if the claims remain joined, the Court would need to carefully distinguish between the different claims against the different parties throughout the litigation.  Further, the plaintiff seeks class certification and relief.  Dkt. No. 1 ¶¶ 53–59.  But because the plaintiff's prospective-relief claims are moot as to UT, class relief is also moot as to UT.  *See supra* n.8.  Fashioning a class and relief as to only Tech would be much more difficult if Tech remained joined in the same lawsuit with the non-class-action UT defendants.  Second, because Tech and UT operate under different governance systems and policies and because each school has its own admissions policies, the issues of fact will diverge during discovery, and the claims against the two groups will require different witnesses and proof.  Accordingly, the Court also finds that severance is appropriate under several of the Rule 21 factors, especially the interest of judicial economy.

In sum, the Court finds that the plaintiff's surviving claims against Tech and UT do not arise out of the same series of transactions or occurrences.  As a result, the defendants are misjoined, and the claims against UT are severed from the claims against Tech.

> ### ii.   The claims against UT are transferred to the Western District of Texas, Austin Division.

Because the claims against UT are severed from the claims against Tech, the case against UT must be transferred based on improper venue.  And because the Western District of Texas, Austin Division is most convenient for the parties, the action against UT is transferred there.

First, venue for the suit against UT is no longer proper in this district and division.  "Severance under Rule 21 creates two separate actions or suits where previously there was but one," so the claims against Tech's medical school and officers and the claims against UT's medical schools now function as separate lawsuits.  *See O'Neil*, 709 F.2d at 368.  There is now one separate suit against the Tech defendants and one separate suit against UT Austin, UT Houston, UT Galveston, UT San Antonio, and UT Southwestern.  However, the UT defendants do not reside in the Lubbock Division, and none of the events giving rise to the suit against them occurred in this division.  *See* Dkt. No. 1 ¶¶ 10, 15, 19, 24, 29; 28 U.S.C. §§ 124(a), 1391(b).  Thus, venue is no longer proper here, and the Court finds that it is in the interests of justice to transfer the case against UT to a district and division where it could have been brought.  *See* 28 U.S.C. §§ 1391(b), 1406(a).

There are multiple potential transferee venues here.  UT seeks to transfer the case to the Western District of Texas, Austin Division, Dkt. No. 36 at 15, while the plaintiff opposes transfer, Dkt. No. 45 at 9.  Accordingly, the Court considers the Austin Division of the Western District and the Dallas Division of the Northern District, since the plaintiff

brought suit in the Northern District.  *See* Dkt. No. 1 ¶¶ 10, 29.  The Court looks to the

Section 1404(a) factors to determine which district is more convenient.  *See CUPP*

*Cybersecurity LLC*, 2019 WL 1070869, at *6.  Under Section 1404(a), courts analyze four

private interest factors and four public interest factors when considering a motion to

transfer.  *Volkswagen II*, 545 F.3d at 315.  In this analysis, "[c]ourts do not afford significant

weight to general allegations that a particular forum would be more convenient for

unspecified witnesses."  *McNew v. C.R. Bard, Inc.*, No. 1:19-CV-195-H, 2020 WL 759299, at

*2 (N.D. Tex. Feb. 14, 2020).  However, because this transfer is pursuant to Section 1406(a)

and venue is improper in the Lubbock Division, UT does not have to show that its preferred

venue is "clearly more convenient" than the plaintiff's choice of venue.  *See CUPP*

*Cybersecurity LLC*, 2019 WL 1070869, at *7.

The first private factor, access to sources of proof, weighs in favor of transfer to

Austin.  Although "access to some sources of proof presents a lesser inconvenience now"

due to technological advancements, the Fifth Circuit has noted that this factor remains "a

meaningful factor in the analysis."  *Volkswagen II*, 545 F.3d at 316.  The Fifth Circuit has

also noted that the movant's burden "requires an actual showing of the existence of relevant

sources of proof, not merely an expression that some sources likely exist in the prospective

forum."  *Def. Distributed*, 30 F.4th at 434.  Here, UT does not identify any particular

documents or physical evidence located in Austin.  *See* Dkt. Nos. 36 at 17–18; 51 at 12–13;

51-1 at 2–3.  In addition, in either Austin or Dallas, the sources of proof for the four other

schools would still be located outside of that city.  However, UT notes that the UT Board of

Regents, which passed the Regents' Rule allowing affirmative-action policies and generally

governs the UT system, "convenes and has its principal place of business in Austin."  Dkt.

No. 36 at 17; *see also* Dkt. No. 36-1 at 5.  Indeed, evidence—both documentary and

testimonial—about the Board's approval of each school's affirmative-action policies will

likely be relevant and will likely be located in Austin.  Further, some witnesses in Austin

may be able to provide testimony or evidence about the entire UT system and UT's policies

in general.  Thus, this factor favors Austin.

  The second private factor, the availability of compulsory process, is neutral.  This

factor focuses on "[a]ccess to compulsory process for non-party witnesses."  *Def. Distributed*,

30 F.4th at 434.  Under Federal Rule of Civil Procedure 45(c), a federal court's subpoena

power allows it to "command a person to attend a trial, hearing, or deposition . . . within

100 miles of where the person resides, is employed, or regularly transacts business in

person."  Fed. R. Civ. P. 45(c)(1)(A).  Further, a court may "command a person to attend a

trial, hearing, or deposition . . . within the state where the person resides, is employed, or

regularly transacts business in person, if the person (i) is a party or a party's officer; or (ii) is

commanded to attend a trial and would not incur substantial expense."  Fed. R. Civ. P.

45(c)(1)(B).  UT has presented an affidavit stating that members of each medical school's

admissions committee may be witnesses in this case, because they make admissions

decisions.  Dkt. No. 51-1 at 3.  And again, UT also notes that the UT Board of Regents

"convenes and has its principal place of business in Austin."  Dkt. No. 36 at 17; *see also* Dkt.

No. 36-1 at 5.  However, it appears that each of these witnesses resides, is employed, or

regularly transacts business in Texas and thus could be commanded to attend a trial within

Texas, and UT has not addressed whether these witnesses would incur a substantial expense

in doing so.  *See* Fed. R. Civ. P. 45(c)(1)(B).  And it appears that the admissions officials, if

re-named as defendants, reside, are employed, or transact business in Texas and thus could

be commanded to attend a trial or deposition within the state.  Finally, a federal court in either Austin or Dallas could command a witness, such as a member of the admissions committee, to attend a deposition within 100 miles of their place of employment—the medical school.  *See* Fed. R. Civ. P. 45(c)(1)(A).  Thus, this factor is neutral.

The third private factor, cost of attendance for willing witnesses, weighs in favor of Austin.  When considering this factor, courts in the Fifth Circuit apply a 100-mile threshold: "When the distance between an existing venue for trial of a matter and a proposed venue under [Section] 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relation to the additional distance to be traveled."  *Volkswagen II*, 545 F.3d at 317 (quoting *Volkswagen I*, 371 F.3d at 204–05).  Here, Austin is more than 100 miles away from Dallas.  San Antonio, Houston, and Galveston are each a little closer to Austin than to Dallas, so transfer to Austin would result in a lower cost of attendance for willing witnesses in those cities.  Further, although the plaintiff's witnesses would have to be involved in the litigation in both Lubbock and the second forum, the distances between Lubbock and Dallas versus Austin are only slightly different.  However, if the case were transferred to Austin, the cost of attendance for Austin witnesses would simply shift to Dallas witnesses.  Because this case must be transferred to a different division, and Austin is slightly more convenient for the witnesses, this factor weighs in favor of transfer to Austin.

The fourth private factor—other practical problems that make the case easy, expeditious, and inexpensive—weighs in favor of Austin.  UT argues that because "there is a pending case involving the University of Texas admissions policies in the Austin Division," transferring this case there could "allow the judge to organize the proceedings to accommodate experts, other witnesses, and counsel," even if the cases would not be

consolidated.  Dkt. No. 36 at 19 n.7 (quoting *McNew*, 2020 WL 759299, at *3); *see Students for Fair Admissions, Inc. v. University of Texas at Austin*, No. 1:20-cv-763 (W.D. Tex. filed July 20, 2020).  Accordingly, transfer to Austin could allow that court to more efficiently process both cases, and this factor weighs in favor of transfer to Austin.

Next, the public factors.  The first public factor, court congestion, slightly favors the Dallas Division.  UT argues that the Western District has slightly lower court congestion, including slightly shorter median filing-to-disposition and filing-to-trial periods, although it admits that "the difference is not great."  Dkt. No. 36 at 19 (citing *U.S. District Courts— Federal Court Management Statistics—Comparison Within Circuit* (June 23, 2023), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distcomparison0630. 2023.pdf [https://perma.cc/QNP6-8JZC].  However, the most recent statistics indicate that those periods are now slightly shorter for the Northern District than the Western District. *See U.S. District Courts—Federal Court Management Statistics—Comparison Within Circuit* (Dec. 31, 2023), https://www.uscourts.gov/sites/default/files/fcms_na_distcomparison1231. 2023.pdf [https://perma.cc/4FVA-JBC5].  Thus, this factor slightly favors Dallas.

The second public factor, the local interest in having localized interests decided at home, is neutral.  This factor looks to "the significant connections between a particular venue and the events that gave rise to a suit."  *Def. Distributed*, 30 F.4th at 435 (quoting *In re Apple Inc.*, 979 F.3d 1332, 1345 (Fed. Cir. 2020)).  The focus is on "the events—not the parties" and on "the interest of non-party citizens in adjudicating the case."  *In re Clarke*, 94 F.4th 502, 511 (5th Cir. 2024) (emphasis omitted).  UT argues that Austin has a greater local interest in adjudicating the plaintiff's claims because "the policy decisions of the [UT] Board of Regents" and the approval of any affirmative-action policy used by the defendant

medical schools took place in Austin.  *See* Dkt. No. 36 at 20.  And because the UT system is centered in Austin, the citizens of Austin may have a greater interest in adjudicating a case about the system's affirmative-action policies.  However, in another sense, the events that gave rise to suit—the admissions decisions—occurred at each medical school, giving Austin, Dallas, and every other city where a defendant UT medical school is located a local interest in adjudicating this case.  And when a case concerns "statewide" conduct, it is often "not the sort of localized case where the citizens of Austin have a greater 'stake' in the litigation than the citizens of [other cities]."  *In re Planned Parenthood Fed'n of Am.*, 52 F.4th 625, 632 (5th Cir. 2022).  Similarly, the plaintiff argues that the legality of affirmative-action programs "is a national issue that has effects everywhere," so "Austin has no more interest in adjudicating this case than Lubbock or any other city."  Dkt. No. 45 at 11.  Thus, the Court concludes that this factor is neutral.

The third public factor, the familiarity of the forum with the law that will govern the case, slightly favors Austin.  The parties agree that federal courts are equally competent to determine the issues of federal law involved.  *See* Dkt. Nos. 36 at 18; 45 at 10.  UT argues that the Austin Division has considered both a previous challenge under now-overruled standards and a current challenge to the consideration of race in undergraduate admissions by the University of Texas at Austin.  Dkt. No. 36 at 18–19.  Thus, perhaps that court can more efficiently process this case against UT.  But given the recency of *SFFA* and its sea change in law, the Court finds that this factor only slightly favors transfer to Austin.

Finally, the parties agree that there is no issue regarding conflict of law, so the fourth public factor is neutral.  *See* Dkt. Nos. 36 at 16 n.6; 45 at 10–11.

In sum, access to sources of proof, costs of attendance, and considerations of other practical problems weigh towards transferring to Austin over Dallas.  The factor of familiarity with the governing law weighs slightly in favor of Austin.  The factors of compulsory process, localized interests, and conflict of laws are neutral.  And the factor of court congestion weighs slightly towards Dallas.  After balancing these factors, the Court concludes that UT has shown that the Western District, Austin Division is more convenient for the parties and witnesses.  Thus, the case against UT is transferred to the Western District of Texas, Austin Division, under Section 1406(a).

**4.     Conclusion**

The Court grants in part and denies in part UT's motion to dismiss (Dkt. No. 35) and Tech's motion to dismiss (Dkt. No. 33).  UT has shown that the plaintiff's race-based claims for prospective declaratory and injunctive relief are moot in the wake of *SFFA* and the repeal of Regents' Rule 40304.  Those claims against the UT defendants are dismissed without prejudice under Rule 12(b)(1).  Next, the plaintiff has established his standing for his remaining race-based claims and has plausibly alleged that the defendants used race-based admissions preferences, but he has not plausibly alleged the use of sex-based admissions preferences.  Accordingly, his Title IX claim and his sex-based Equal Protection claim are dismissed under Rule 12(b)(1) and Rule 12(b)(6).  With no claims remaining against them, the individual UT defendants are dismissed entirely.  The plaintiff's Title VI, Section 1981, and Equal Protection claims based on racial preferences survive against all Tech defendants, and his Title VI claim survives against the institutional UT defendants for damages.  The Court grants the plaintiff leave to amend his complaint within 14 days from the date of this Order.

However, the plaintiff's claims against UT cannot proceed with the claims against Tech in this Court.  The UT defendants are improperly joined with the Tech defendants under Rule 20 because the claims against the two groups do not arise out of the same series of transactions or occurrences.  Once severed, the claims against UT are not properly brought in this division.  But the claims could have been brought in Austin, and Austin is the most convenient venue for the parties.  Accordingly, the Court grants UT's motion to sever and transfer the claims against UT to the Western District of Texas, Austin Division (Dkt. No. 36).  The Clerk of Court is directed to sever the claims against the remaining UT defendants—University of Texas at Austin, UT Health Science Center at Houston, UT Medical Branch at Galveston, UT Health Science Center at San Antonio, and UT Southwestern Medical Center—into one separate action and transfer that new civil action to the Western District of Texas, Austin Division.

So ordered on July 17, 2024.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE